NELLIE T. BOYD AS ADMINISTRATRIX AND H. W. BOYD AS
ADMINISTRATOR OF THE ESTATE OF W. T. BOYD, DE-
CEASED, AND NELLIE T. BOYD IN HER OWN RIGHT, *Ap-
pellants*, v. LILLIAN MAYRUE GOSSER, *Appellee*.

Opinion Filed July 1, 1919.

The genuineness of a signature may be ascertained by com-
parison of the disputed signature with an admittedly genuine
one, and when upon such comparison the two signatures are so
much alike in the many features of their construction that they
agree or correspond in lines, angles, slant and space occupied,
the fact of such correspondence is deemed to be evidence of highly
probative value that one is a tracing of the other, or a drawing
from a model.

Decree reversed.

*James F. Glen* and *Kenneth I. McKay*, for Appellants;

*Whitaker, Himes & Whitaker*, for Appellee.

ELLIS. J,—Upon the first hearing of this case we af-
firmed the decree of the Chancellor by applying the rule
so often announced by this court that the findings of the
Chancellor on the evidence will not be disturbed unless
such findings of fact are clearly shown to be erroneous.
We stated in the opinion that there was much apparently
credible positive evidence in the record to the effect that
the signatures to the two documents involved were gen-
uine. Both the rule and the statement of fact are cor-
rect, but the error in the conclusion arrived at upon the
first hearing consisted in treating the testimony of the
witness, William J. Kinsley, the expert on hand writing,
as merely opinion evidence.

It was something more than the mere opinion of the witness. It was a detailed statement of facts relating to the questioned signature of W. T. Boyd, which was appended to the two documents. Facts which were revealed by the use of mechanical instruments and scientifically established to the degree of demonstration. These facts we deem to be wholly irreconcilable with the evidence of witnesses who testified to the genuineness of W. T. Boyd's signature, which testimony, although apparently credible, is not by any means indubitable when considered in the light of the facts established by the scientific investigations of the expert on handwriting. When so considered this "apparently credible positive evidence" loses much if not all its character, and "If the salt hath lost its savor wherewith shall it be salted?"

It was said in Gordon's Case, 50 N. J. Eq. 397, 26 Atl. Rep. 268: "Handwirting is an art concerning which correctness of opinion is susceptible of demonstration." The learned Judge writing the opinion said: "I am fully convinced that the value of the opinion of every handwriting expert, as evidence must depend upon the clearness with which the expert demonstrates its correctness." The demonstration, when the signature of a person since deceased is attacked as a forgery, consists as in this case of an accumulation of a great mass of facts relating to the formation of letters, the field covered by both the admittedly genuine and questioned signatures; the spacing of the letters, both capitals and small letters; the angles on which they were formed; their relative positions in the signatures; their proportions, slant, alignment and outline; the surface of the paper which under the microscope shows whether the line upon which the questioned signature rests was drawn before or after the name was

written or before or after the paper was folded; the conformity in detail of two signatures so that when superimposed they show no variation or divergence in a line or direction of a line. All these facts when established may confirm the testimony of apparently credible witnesses who testify to the genuineness of the questioned signatures, or establish to the degree of demonstration the falsity of it. In the Rice Will case, 81 App. Div. 223, 81 N. Y. S. 68, affirmed, in 176 N. Y. 570, 68 N. E. Rep. 1123, it appeared from the photographs and enlargements adduced by an expert that the four signatures to a will were absolutely identical so that they could be superimposed without showing the slightest divergence in the length or direction of a line. This the court said demonstrated conclusively that they were not genuine, but tracings. See also Osborn on Questioned Documents, p. 299; Green v. Terwilliger, 56 Feb. Rep. 384; Stitgel v. Miller, 250 Ill. 72, 95 N. E. Rep. 53, Ann. Cas. 1912B, 412. In the note to the last cited case which appears in Annotated Cases, Vol. 23, many cases are referred to as upholding the proposition that it is very improbable that two signatures written by a person in the ordinary course of business will be exactly alike so that one will cover the other when superimposed, and the fact that one signature is the facsimile of another is evidence that one was traced from the other, or both traced from a third. The cases cited are: McDonogh's Succession, 18 La. Ann. 419; Day v. Cole, 65 Mich. 129, 31 N. W. Rep. 823; Hunt v. Lawless, 7 Abb. N. Cas. (N. Y.) 113; Matter of Rice, 81 App. Div. 223, 81 N. Y. S. 68; Matter of Burtis, 107 App. Div. 51, 94 N. Y. S. 961; Matter of Burtis, 43 Misc. 437, 89 N. Y. S. 441; Hanriot v. Sherwood, 82 Va. 1.

In the Matter of Burtis, *supra,* it was said: "Concededly if one's signature conforms in every particular to another, one of them must be a forgery, because for all practical purposes no person *can* write his name twice exactly alike." See also "The conclusion of a handwriting expert as to the genuineness of a signature standing alone would be of little or no value, but supported by sufficient cogent reasons his testimony might amount almost to a demonstration." Venuto v. Lisso, 148 App. Div. 164, 132 N. Y. S. 1066. See also 3 Wigmore on Evidence, Sec. 2014; McKay v. Lasher, 121 N. Y. 477, 24 N. E. Rep. 711.

In Osborn's Questioned Documents, page 281, the author says: "No two genuine signatures can be exactly alike, but such a statement should be understood to be true, speaking microscopically, and not as the carpenter measures, because by examining a great number of genuine signatures of certain exceptional writers' signatures can be found which are nearly identical."

It is not contended that the two signatures of W. T. Boyd to the documents of December 4, 1911, and February 25, 1912, are microscopic duplicates of each other, but there is such great similarity in proportions, spacing, slant, alignment and outline as to convincingly show that the two signatures were the work of a copyist, one who drew from a model, and when these signatures are compared under a magnifying glass with the signature of W. T. Boyd upon the back of the note for $1000.00 dated 12/4-1911, and signed by L. M. Gosser—complainant's exhibit XX16—the conclusion becomes irrefutable.

The improbability that a man of Mr. Boyd's education, business training, habits and physical infirmities which the evidence showed him to be, could on three different times at dates covering a period of about two and one-

half months write his name to three legal documents, in the usual easy and free manner in which a man of affairs signs such documents, with such similarity as to be almost fac-simile, so that when superimposed they correspond almost line for line, angle for angle, slant for slant, space for space, takes the matter beyond the range of reasonable conjecture, even though the genuineness of the signatures may be testified to by eye-witnesses apparently credible.

The comparison of handwriting for the purpose of ascertaining the characteristic or structural differences is one of the recognized means of arriving at the truth when the question is the genuineness of the signature. And it is generally conceded that if one signature coincides with another, one of them is a drawing or tracing, something made according to pattern or a model; and as a man when signing his name to a contract never takes such pains with his signature, certainly in this case there is no evidence that Boyd did, it follows that one of the signatures at least is not the writing of the person whose signature it purports to be. See Ames on Forgery, Chap. IV. See also the views upon this proposition as expressed by Professor Benjamin Pierce, formerly of Harvard College as reported in 4 American Law Review, p. 649.

So we have in this case upon the one side the law of mathematical probabilities, and upon the other the law of moral probabilities. "Preponderance of the evidence" is a phrase which in its last analysis means probability of its truth. In a cause where there is conflicting moral evidence, the jury in the one case, the Chancellor in the other, is required to decide accordingly as the weight of the evidence preponderates in favor of one proposition or the other. That is to say, having no personal

knowledge of the transaction under investigation, they must by the application of common knowledge and experience decide which set of witnesses or line of evidence raises the greater probability of its consistency with truth.

In the use of demonstrative evidence one relies upon the evidence of his own senses. It is therefore evidence of the highest rank. It is the ultimate test of truth. To this class belongs mathematics, because a proposition in mathematics may be established by the evidence of one's own senses. Moral evidence depends for its value upon veracity on the one hand and credulity upon the other; so in testing the truth of a witness' statement one must therefore draw upon his fund of common knowledge and experience of men and affairs, if like a prudent man who "looketh well to his going," he would decide in accordance with that which seems most probable.

In the case at bar we have the uncontradicted evidence of the expert on handwriting. The questioned signatures and photographs of them are before the court as well as signatures admittedly genuine, and photographs of them. Some enlarged for convenience of comparison, and the means were at hand for measurements and other comparisons embracing the whole field of examination. So that the facts to which the expert witness testified concerning the characteristics and construction of the signatures are matters within the field of demonstrative evidence. These facts being established by evidence of the first rank are strongly presumptive of the further fact that the signatures in question are tracings or drawings by a hand other than the person whose signatures they purport to be, and this presumption is supported by the mathematical law of probabilities as well as the common experience

and knowledge of man.  As. against this the complainant offered the testimony of witnesses who claimed to be eye-witnesses to the making of the questioned signatures by Mr. Boyd, and others who testified that Mr. Boyd had remarked to them in conversation casually that he had sold the property in question to Mrs. Gosser.  It is not my purpose to quote this testimony to show its many inherent discrepancies and weaknesses.  Such for instance as the testimony of W. R. Newman, the railroad agent, "over warehouse" who said that while on a visit to Tampa on May 11, 1912, he called to see Mrs. Gosser and loaned her $2,000.00, which he carried on his person and for which he had worked during the years of his service to the railroad; that he never put his money in banks, but kept it in his trunk, and had it on his person at the time.  That again in June following he made another loan to her of $1,575.00, and later another loan of $500.00.  And on another occasion he borrowed $5,000.00 from a laundryman in Norfolk and loaned that to Mrs. Gosser.  That the laundryman gave him the money in currency "in the laundry," no one present, no security taken, some of which this witness sent to Mrs. Gosser by mail in a package as merchandise, and some by express as merchandise, taking no security from Mrs. Gosser for the repayment of the loan.  Applying the common knowledge and experience of men to this man's testimony it tests the utmost capacity of the most credulous.   Likewise the testimony of others who claimed to be eye-witnesses contains highly improbable statements, and just in the degree that such testimony is inherently improbable as measured by the test of common knowledge and experience the probability that the questioned signatures are forgeries increases. In this view of the evidence we are of the opinion that the

decree of December 27, 1916, was erroneous, that it was manifestly against the weight of the evidence and clearly erroneous.

So the decree is reversed.

BROWNE, C. J., AND TAYLOR, J., concur.

WHITFIELD AND WEST, J. J., dissent.

WHITFIELD, J., dissenting.—The Chancellor specifically found "that W. T. Boyd, in his life time, made and entered into the two contracts in writing with the complainant," and "that the complainant, in the life time of the said W. T. Boyd, made to him the payments in the said bills of complaint alleged." While the evidence on these material points is conflicting, there is ample evidence to sustain the specific findings, and such findings do not clearly appear to be contrary to, but to be in accordance with, the preponderating weight and probative force of the evidence considered as an entirety. As a necessary consequence, the decree appealed from is "such a decree as the court below ought to have given," within the requirements of Section 1707, General Statutes, 1906, Florida Compiled Laws, 1914.

WEST, J., dissenting.—Applying the well-settled rule that the findings of the Chancellor on the evidence will not be disturbed unless such findings of fact are clearly shown to be erroneous, I am still of the opinion that there is ample evidence in the record to support the decree of the Chancellor as was held in the original opinion and therefore dissent from the opinion filed upon the rehearing in the case.